RODNEY S. DUNLAP ET AL., APPELLEES, V. LOUP RIVER PUBLIC POWER DISTRICT, APPELLANT.

284 N. W. 742

FILED MARCH 17, 1939. No. 30436.

*August Wagner* and *C. N. McElfresh,* for appellant.

*Cook & Cook* and *Abbott, Dunlap & Abbott, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

PAINE, J.

This action for damages arose out of an application of the Loup River Public Power District, defendant and appellant, to acquire a perpetual right of way easement across lands of the plaintiff by eminent domain for the purpose of erecting a high power transmission line. As a result of the proceedings in the county court, the five appraisers on October 1, 1937, allowed the following sums: $1,500 for damage to farm, $15 for crop damage, and $175 for damage to trees, making a total allowance of $1,690 damages. From this award an appeal was taken to the district court by the defendant power district, and a jury returned a verdict for $50 crop damage, and for other damages $2,066, making a total, with interest, of $2,158, for which judgment was entered. The defendant has appealed.

Plaintiff is the owner of 240 acres of bottom land in the Platte valley, located about five miles southeast of Fremont. This farm is highly improved, and is used as a dairy farm. The north 160 acres is crossed diagonally by a large drainage ditch of the Elkhorn Drainage District, the right of way being 60 feet in width, although the ditch itself is only about 20 feet wide, but it separates the 160 acres into two parts. All of the buildings are located in the northeast corner of the 160-acre tract, being at the farthest point from the ditch and the transmission line, which is on the far

side of the ditch from the buildings. The 80 acres lie directly south of the 160 acres.

Nearly all of the land is tillable, and 'practically all is under cultivation, and requires the use of heavy machinery, such as large tractors, plows, harvesters, and combine, said farm being alleged to be of the reasonable value of $48,000. The defendant's high-powered transmission line will carry an electric current having a voltage of 115,000 volts to Omaha from the defendant's power plant near Columbus. In the petition it is alleged that, by reason of the construction of this high-powered line, the plaintiff's land will be damaged in the full sum of $11,300.

The evidence discloses that this power transmission line enters this land some 224 feet east of the northwest corner of the land, and runs in a straight line southeast across the middle of the northwest quarter, running almost parallel with, but from some 200 to 300 feet to the west of, the drainage ditch across said quarter-section, and continues in a straight line across the northeast corner of the plaintiff's south 80 acres.

The first structure to be built as it enters the farm from the north is 115 feet from the boundary line, and is a four-legged steel tower, type "TAP," being 23 feet square on the ground. The second structure is type "HTP," being located 660 feet away, and consists of two large poles, set 14 feet, six inches apart, with necessary bracing between the poles, and two cross-arms at the top extending 29 feet in width, all set at right angles with the line. It is 675 feet to the third structure, similar to the "H" type structure just described, and the fourth, fifth, and sixth structures are built on the same plan. The entire length of the transmission line is 3,978 feet upon the farm of plaintiff, and the three wires of the line itself will be 27 to 30 feet in the air.

On January 12, 1938, the plaintiff duly filed an assignment of the full amount of any award he might secure to the Federal Land Bank and the Federal Farm Mortgage Corporation, to be applied in reduction of mortgages now held by said corporations upon the land herein.

In the argument much attention was given to the danger inherent in this line. Plaintiff calls attention to the testimony of two engineers, who testified that they would place a limit of 15 feet as the nearest that a person should come to a transmission line carrying 115,000 volts, and that a man on a load of hay would be partially grounded, and if he had a pitchfork in his hand he could receive a shock that might endanger his life.

Testimony was to the effect that it would be very hard to turn a big tractor drawing a drill around these posts. It was also said that weed patches would grow around each one of these big posts, and would have to be cut out by hand, and would be unsightly. It is extremely dangerous to operate a combine near such a transmission line, as the line stretches in hot weather and sags down. We are asked to consider that the power district has a perpetual right to go across this land with trucks and equipment at any and all seasons of the year.

Testimony was given of the difficulty of putting up alfalfa and of planting check-rowed corn near these large poles. Evidence was also taken of the height reached by combine and hay stackers when near this line, which is 27 to 30 feet in the air.

Seven very large cottonwood trees were cut down in building the line. Plaintiff contends they were of great benefit in the pasture to shade the live stock. Defendant claims it was compelled to run its line straight to avoid loss of current, and so could not follow line of drainage ditch, or avoid the large trees, and that the trees are of no real value, and the only damage in cutting them is an inconvenience of farming around the stumps, the same as around the standards erected in the line.

The first assignment of error and proposition of law are based on the overruling of defendant's motion for a change of venue. Section 20-410, Comp. St. 1929, provides for such an order if it appears that a fair and impartial trial cannot be had. There was a nine-page motion filed for change of venue. It appears that two applications were

filed by the defendant in the county court to acquire this right of way. The first was filed July 30, 1937, and certain action of the appraisers was criticized by defendant, and the second application was made on September 11, 1937. The motion for change of venue was supported only by a single affidavit of C. N. McElfresh, one of the attorneys for defendant. This affidavit, although filed in the office of the clerk, was not incorporated in the bill of exceptions, and not offered as evidence in the district court, and therefore cannot be considered. *In re Estate of Lyell*, 116 Neb. 827, 219 N. W. 189; *Hannah v. American Live Stock Ins. Co.*, 111 Neb. 660, 197 N. W. 404. There was no error in the trial court overruling this motion for change of venue. *Markel v. Glassmeyer*, 132 Neb. 716, 273 N. W. 33.

As to the dangers of this line, a great deal of testimony was brought out, over objections, about the respective heights of a combine, a hay stacker, and of a man on a load of hay, and that, because of the tools used in stacking hay, no stack should be placed nearer than 50 feet from the transmission line. Much evidence was also taken as to the necessity of giving warnings of the dangers inherent in a line carrying perhaps the highest voltage in the state.

D. J. DeBoer is the chief electrical engineer of the defendant company. He testified that this transmission line runs straight for nine miles at this point; that it is not practical to follow section lines or drainage ditches; that each of the three "wires" making up the transmission line are made as follows: A steel core, made up of seven strands of wire, with 26 strands of aluminum wire on the outside. With this construction the steel core carries the weight of the span of 600 or 800 feet, while the aluminum carries the electrical current. Under the worst weather conditions, which are one-half inch of ice all around the wire, at a temperature of zero, and a 54-mile-an-hour wind, this line, according to the estimates of the United States Bureau of Standards, would be carrying a load of 6,860 pounds, but this line can stand a load of 14,000 pounds before it will break. The poles are 50-foot western cedar poles, having a

life of 25 to 40 years; the cross-arms are of Douglas fir, with a life of 15 years. The wire will not need replacement for 50 years. A steel tower, such as the one on plaintiff's farm, is erected every four miles to support the line in all directions. Each structure is equipped with protector tubes to drain the lightning or static charges from the line. Mr. DeBoer testified that the safety of any one who would come within 10 feet of these wires might be menaced, that is, their lives might be in danger. The plaintiff's engineers testified that 15 feet was the nearest one should approach the wires.

In the case at bar, the easement simply grants the right to the power district to go upon and over the farm to construct, repair, rebuild, or maintain this one steel structure and five pairs of poles, and the transmission lines. The life of the materials used is so long that the use of the easement by a truck, after the original construction, may only be made at intervals of years. The land can be farmed around the poles as before, with some inconvenience. No land is purchased by the power district, and the plaintiff will still pay all of the real estate taxes upon the land included in the easement.

"When an easement is taken which still leaves the owner with property rights of material and measurable value, the condemnor need not pay for the entire value of the fee simple. But in these cases—such as in the cases where an electric power company runs wires over the owner's property—compensation is based, not on the separate value of the easement but rather on the damage to the owner's entire property attributable to the taking of the easement and to the prospective use which the taker will make of it." Orgel, Valuation Under Eminent Domain, 355.

The main question, therefore, was the damages to the farm as a whole, and the trial court in the case at bar gave the instruction No. 3, in which the court first instructed as to crop damage, etc., and then said:

"You will then proceed to determine from a preponderance of the evidence, the damages to the whole farm caused

by the construction of the line over the same, and in determining this you may take into consideration every element of annoyance, inconvenience, danger and disadvantage resulting from the construction and maintenance of the line which would influence an intending purchaser's estimate of the market value of such property, including danger from the transmission lines, if any; annoyance, if any you find, which would result from defendant's perpetual right to enter plaintiffs' lands to maintain, repair and rebuild the line; inconvenience, if any, by reason of the structures and lines; danger, if any, that weeds might grow around the poles and structures; damage, if any, by the cutting of trees and all other disadvantages, annoyances, dangers and inconveniences referred to in the evidence. In fixing the amount of plaintiffs' damages you will ascertain the reasonable market value of the premises immediately before the building of said line and the reasonable market value immediately after the line is built and allow plaintiffs the difference. Market value is based upon the market value at the time of condemnation on Sept. 11, 1937. The reasonable market value of the land is the price which the real estate would bring if it were offered for sale by one who desires but is not obligated to sell, and is bought by one who is willing to purchase but is not compelled to buy."

Attacks are made upon this instruction from many angles; first, because it allows the jury to take into consideration the "danger" from transmission lines, if any.

Mere general fears from the presence of a transmission line cannot be made the basis upon which to predicate any depreciation in market value, for ill-defined fear that at some unknown time in the future some misfortune may come to man or beast by reason of the transmission line cannot enter into the consideration of those who are required to fix the amount of the damages. But, on the other hand, if such fears be reasonable, not speculative nor ill-defined, but founded on practical experience, and if such fears are entertained so generally as to enter into the calculations of all who propose to buy or sell, can it logically

be said that they do not depreciate the market value of property? If an owner cannot sell his property at as good a figure with this line across it as he could before, then his land may be depreciated on account thereof. See *Kentucky Hydro-Electric Co. v. Woodard,* 216 Ky. 618, 287 S. W. 985; 10 R. C. L. 156, sec. 137; *St. Louis, E. R. & W. R. Co. v. Oliver,* 17 Okla. 589, 87 Pac. 423, 10 Ann. Cas. 748; *Illinois Power & Light Corporation v. Peterson,* 322 Ill. 342, 153 N. W. 577, 49 A. L. R. 692.

In an exhaustive discussion of these questions by Charles T. McCormick, professor of law at Northwestern University, and found in 17 Minn. Law Review, 461, it is said that all of the public injury that will flow from the public improvement is to be considered in the light that it would be considered by a prospective purchaser, but speculative and unlikely possibilities of harm are to be excluded, as well as the possibility of unlawful or negligent construction or operation of the power plant. It has been held, in decisions relating to condemnation of rights of way for electric power transmission lines, that it is necessary to curb the over-imaginative speculations as to possible dangers. Evidence of the necessity of the entry of the power company's employees upon the land to patrol and repair the line, and the probable consequent disturbance of cattle as bearing upon the value of grazing land, is competent (*Missouri Power & Light Co. v. Creed,* 32 S. W. (2d) (Mo. App.) 783), as is also proof of public inconvenience to and obstruction of farming operations by such a power line (*Illinois Power & Light Corporation v. Barnett,* 338 Ill. 499, 170 N. E. 717).

Our court is committed to the rule: "The jury in fixing the damages sustained by a landowner in consequence of the appropriation, or injury, of his property for a public use may take into account every element of annoyance and disadvantage resulting from the improvement which would influence an intending purchaser's estimate of the market value of such property." *Chicago, R. I. & P. R. Co. v. O'Neill,* 58 Neb. 239, 78 N. W. 521. See, also, *Kayser v.*

*Chicago, B. & Q. R. Co.,* 88 Neb. 343, 129 N. W. 554; *Beckman v. Lincoln & N. W. R. Co.,* 85 Neb. 228, 122 N. W. 994; *Omaha S. R. Co. v. Todd,* 39 Neb. 818, 58 N. W. 289; *Chicago, B. & Q. R. Co. v. O'Connor,* 42 Neb. 90, 60 N. W. 326; *McGinley v. Platte Valley Public Power and Irrigation District,* 133 Neb. 420, 275 N. W. 593; *Lilienthal v. Platte Valley Public Power and Irrigation District,* 134 Neb. 281, 278 N. W. 492.

Several of the propositions of law advanced for reversal are based upon the evidence of fear of danger allowed by the court to go to the jury, especially as to this fear expressed by farmers with no scientific knowledge of their own. It is insisted by the power district that it is not an insurer against the dangers arising from such power line, and that no legal duty requires it to give warnings of the danger of such line, and that the court gave undue prominence to, and overemphasized the gravity of, such danger, which was an invasion of the province of the jury.

In the case of an electric line going across a man's farm, the question is simply how much damage has been done to the farm. A perpetual easement constitutes an infringement of the former and previous rights that the farmer had in the land, and, as one of the elements of his loss, he is entitled to recover damages to whatever extent his former method of farming that land has been interfered with. The free use of that land is a property right, and whatever infringes on that must be paid for as damaging the land.

From a painstaking examination of the entire record, we find no prejudicial errors in the instructions, or in the admission of evidence, and yet we are convinced that the evidence does not warrant a recovery of damages in the sum of $2,158, while another trial would cause delay and additional costs.

In the opinion of this court, the sum of $1,500 would be sufficient to cover all the damages to this farm in running this power line over it, considering that its location is far removed from the buildings, and its course is somewhat parallel with and near the drainage ditch which crosses this same farm land.

If the plaintiffs file a remittitur reducing the judgment to $1,500 within 30 days, the judgment of the lower court will be affirmed as thus modified, otherwise the same will be reversed.

AFFIRMED ON CONDITION.