[Civ. No. 7091. Third Dist. Feb. 20, 1945.]

EDMUND L. THOMPSON et al., Respondents, v. WILLIAM K. SIMONDS et al., Appellants.

Rutherford, Rutherford & Rutherford for Appellants.

Clarence N. Riggins for Respondents.

ADAMS, P. J.—Plaintiffs sued to quiet title to the water of a certain creek or ravine on premises conveyed by Sarah H. Edgington and Hallie Olita Edgington to Ruth Grigsby by deed dated October 5, 1905. They asserted their right under and by virtue of a reservation of water rights in the above mentioned Grigsby deed and their subsequent acquisition of said rights by mesne conveyances. They also claimed right by prescription, alleging that for more than five years prior to December 15, 1941, they had used the water on their lands and had maintained the pipes, sluices and boxes on lands now owned by defendants, and entered on said lands whenever necessary "openly, notoriously, continually, and adversely" to defendants and their predecessors in title, and had at all times asserted to them their right to take said waters and to enter on the premises now owned by defendants, under the provisions of deeds set forth, under which they deraigned title.

The evidence shows that prior to May, 1905, all of the lands involved in this action belonged to Sarah H. and Hallie Olita Edgington, hereinafter referred to as the Edgingtons, and were part of a tract consisting of about 800 acres, which was crossed by the county road in a northerly and southerly direction. Prior to May, 1904, the Edgingtons gave to J. B. Gardner an option to buy the whole ranch. In May, 1905, they and Gardner deeded 135 acres on the easterly side of the road to J. W. Barnes, the deed conveying "all tenements, hereditaments and appurtenances." On October 5, 1905, the Edgingtons conveyed to Ruth Grigsby all of the land lying west of such road, the deed reserving, however, "all rights to

the water of a certain creek or ravine on said premises, which said creek or Ravine extends in a northerly direction from a certain stone bridge, or culvert on the County Road at the junction of the Berryessa and Wooden Valley Roads, together with the right to fence said creek for the purpose of preventing the pollution of the water running therein, by stock or otherwise, and of entering upon said premises for said purpose and of damming said stream, laying and repairing pipes, sluices, boxes and tanks thereon, and across adjacent parts of the land hereby conveyed, and of doing any and all other acts necessary or desirable for the full use and enjoyment of the water from said creek." On November 1, 1905, the Edgingtons conveyed to Jennie E. Gardner, wife of J. B. Gardner, the remaining portion of their land lying on the east side of the county road, said deed conveying also the water right reserved in the Grigsby deed. On August 23, 1927, Jennie E. Gardner and James B. Gardner, her husband, made a conveyance of their land to James Ewing Gardner, the deed conveying also the water right described in the deed from the Edgingtons to Mrs. Gardner, and on September 26, 1930, James Ewing Gardner and his wife conveyed said land to plaintiffs, granting the water right in the same language used in the deeds above mentioned.

In 1915 the northerly portion of the Grigsby property was sold to one Thomas Moore. Said portion, on the death of Thomas Moore, descended to his son Edward T. Moore and his daughter Florence June Moore, who by deed dated December 15, 1941, conveyed same to defendants William K. Simonds and Helen I. Simonds, his wife. This deed made no mention of water rights.

Defendants in their answer to plaintiffs' complaint denied plaintiffs' right to the water claimed by them and denied that they had acquired any right by prescription, asserting that while plaintiffs had used said waters "openly, notoriously and continuously" their use was solely on permission granted by defendants' predecessors in interest, such permission being revocable at will. Defendants also relied upon a judgment in an action brought by J. W. Barnes in 1907 against J. B. Gardner and his wife, in which it was adjudged that Barnes was entitled to take water from a point in the ravine some 300 feet above the stone bridge across the county road and which enjoined the Gardners from interfering with such right.

The trial court made findings in favor of plaintiffs, finding them to be the owners of "the right to take and use all the normal flow of water from two springs situate in a certain creek or ravine on the adjoining premises" conveyed by the Edgingtons to Ruth Grigsby, together with the right to fence same for the purposes recited in the Grigsby deed. It found that defendants have no right, title or interest in any of the waters normally flowing from the said two springs. It further found that at the time plaintiffs acquired title to their property there were pipes and boxes in place conducting water from a spring in the ravine to plaintiffs' property, and that plaintiffs had also taken water from another spring situate in said ravine and had maintained pipes and boxes and had entered upon defendants' lands whenever necessary to repair pipes, etc., for the purpose of conducting said waters to their lands, and that for more than five years prior to December 15, 1941, they had used said water on their lands and maintained said pipes, etc., and had entered upon defendants' lands when necessary, "openly, notoriously, continuously and adversely" to defendants and their predecessors in title, and had asserted their right so to do under the provisions of the said deeds; and that plaintiffs' claims were acquiesced in by the predecessors of defendants for more than five years prior to December 15, 1941. Regarding the Barnes water right it was found that it was a right to take water from the stream at a point 300 feet above a stone bridge on the county road, and that Barnes was still maintaining and using said waters, but that defendants do not own any part of the land conveyed to Barnes and are not in privity with him in any way. As to alleged payments to Moore for use of the water the court found that payments of $1.00 per year were made by the Gardners and by plaintiffs up to 1935, but that in 1935 such payments were discontinued and thereafter plaintiffs continued to use the water without permission from the Moores, and in 1935 had notified them that plaintiffs owned the water; and that thereafter plaintiffs had taken and used same for more than five years without interference by defendants or their predecessors in interest; and that plaintiffs were never tenants of Moore or his successors in interest.

Judgment was entered for plaintiffs, holding them to be entitled, as an appurtenance to their land, to the entire normal

flow of the two springs situated upon defendants' land, and the settling boxes and the pipe line through which they conducted their water prior to the time defendants interfered with them. Plaintiffs were also given judgment for $1,000 damages, and defendants were enjoined from interfering with plaintiffs' restoration of their pipe line to the same condition, size, dimension and course that it occupied for the ten years immediately prior to defendants' entry upon the property now owned by them, and from in any way interfering with the plaintiffs and their successors in interest in taking the entire normal flow of water from the two springs and conducting the same through said pipe line to and upon the plaintiffs' property, and from in any way interfering with the plaintiffs' entering upon the land of said defendants for the purpose of inspecting said springs, settling boxes and pipe line and cleaning out said springs, settling boxes and pipe line and repairing and replacing said pipe line whenever necessary or convenient for the taking of said water from said springs to the plaintiffs' property, and from polluting said water, and from in any way interfering with the springs, water, or plaintiffs' said pipe line, or from placing valves thereon, or from obstructing the flow of said waters through said pipe line in any manner.

On this appeal it is contended by appellants that the water right reserved in the deed to Ruth Grigsby never existed, and that plaintiffs never acquired any right to the waters of the creek or ravine by virtue of any conveyance from the Gardners; that the injunction in the Barnes suit foreclosed the Gardners from taking any waters from the creek or ravine; that Gardner and Thompson were *tenants* of Moore in the use of the water of the springs, and the right to erect the settling box and lay the pipe line therefrom; that Thompson paid *rent* of $1.00 per year for such use to and including 1935, and that their disclaimer of title in Moore only started the five-year period under section 326 of the Code of Civil Procedure; that plaintiffs' complaint on adverse possession is insufficient because exclusive and uninterrupted use was not alleged, and that Thompson did not prove exclusive and uninterrupted use for five years prior to December 15, 1942, and the court did not so find. They also contend that the judgment is too broad in giving plaintiffs the right to place ''boxes, sluices and tanks any place'' upon defendants' lands—stating that under

their prescriptive title plaintiffs are entitled to but one sluice box—and insofar as it allows plaintiffs to use defendants' lands and gives plaintiffs the entire normal flow of the two springs; that the injunction against pollution is too strong since it prevents pasturage of animals upon defendants' land; and, finally, that plaintiffs did not submit any proof of value of the various elements of claimed damage to support the judgment for the full or any amount prayed for in the complaint.

Appellants' contention that what they call the ''Gardner-Grigsby water right'' never existed and that therefore plaintiffs never acquired such a right by conveyance to them of the Gardner lands, appears to be based upon the supposition that prior to the Grigsby deed all rights to the waters of the creek or ravine had been conveyed to Barnes, and that this was established in the Barnes-Gardner action. As hereinbefore stated the Edgingtons' deed to Barnes, while it antedated the Edgingtons' deed to Ruth Grigsby, did not purport to convey a water right, as such, but only the appurtenances to the land conveyed. The record in the Barnes action shows that at the time Barnes took his title he acquired the portion of the Edgington lands upon which were situated the dwelling and other buildings, and that at that time water used therein was taken from a box located in the creek about 200 feet above the Barnes property line from which box it was piped to the dwelling and the grounds surrounding it. The portion of the creek or ravine in which the box was located was within the boundary of the lands which the Edgingtons retained and which they subsequently conveyed to Ruth Grigsby, but it was some distance below the portion of the Grigsby lands subsequently conveyed to Moore and later to defendants in this action. The judgment in the Barnes-Gardner action did not purport to entitle Barnes to anything more than the right to take water from the point where the box was situated when Barnes took his title, and subject to the rights of other riparian owners on the stream, and did no more than enjoin the Gardners from diverting the waters from said Grigsby creek so as to interfere with Barnes' right. The evidence shows and the court found that Barnes and his successors in interest are now using the water right held to be appurtenant to the Barnes land, and that since the judgment in Barnes' favor their use has never been interfered with. Arnold A. Barnes, son of J. W. Barnes the original grantee, who had lived upon the

land at all times since the grant, was called as a witness for defendants and so testified. He stated that the water system is now practically the same as in 1905, that the box is situated about 200 feet above the bridge, and about 75 feet further up the stream is a small dam; that the water in the stream at that point comes down from a hillside spring into the ravine, and that the ravine is dry above it; and that from the bridge to the fence on the Simonds property up the ravine it is a mile or a mile and a half. He further said that no water taken by Thompson has interfered with their water supply. The trial court further found, what must be conceded to be the fact, that defendants in this action are not successors in interest of Barnes, and are not in privity with him in any way. Defendants' claim that plaintiffs could not have acquired any water right by reason of the conveyance to them of the water rights reserved in the Grigsby deed because such right had been conveyed to Barnes prior to the deed to Ruth Grigsby, seems to be inconsistent with defendants' present claim to water upon the lands which they now own, since they deraign title through the Grigsby deed; for if the water right could not have been reserved because it did not exist, by the same reasoning it could not have been conveyed by that deed.

As to appellants' argument that the decree in the Barnes action is res judicata against the claims of plaintiffs because plaintiffs took from the Gardners by title subsequent to the decree in the Barnes action, it is not necessary to so determine as a matter of law, since, as a matter of fact we are satisfied that the evidence shows that the rights involved in that action are not identical with those involved in this one, but are separate and distinct therefrom. (See *Bernhard* v. *Bank of America*, 19 Cal.2d 807, 813 [122 P.2d 892]; *Whitney* v. *City and County of San Francisco*, 52 Cal.App.2d 363, 365 [126 P.2d 367].)

That only is deemed to have been adjudicated in a former judgment which appears upon its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto (Code Civ. Proc., § 1911; *South San Bernardino L. & I. Co.* v. *San Bernardino Nat. Bank*, 127 Cal. 245 [59 P. 699]; *Takekawa* v. *Hole*, 17 Cal.App. 653 [121 P. 296]; *United Bank & Trust Co.* v. *Hunt*, 1 Cal.2d 340 [34 P.2d 1001]); and it does not appear that the rights claimed by plaintiffs were so adjudged in the Barnes decree

or that they were necessarily included therein or were necessary thereto. The contrary appears.

■ Coming next to appellants' claim that plaintiffs and the Gardners before them were *tenants* of the Moores and that their use of water on the land acquired by plaintiffs was permissive up to and including the year 1935, and that plaintiffs did not thereafter use the water for the prescriptive period of five years, we note that defendants in their answer alleged and that in their briefs before this court they assert that in 1922 Thomas Moore and J. B. Gardner entered into a *rental* agreement whereby Gardner rented from Moore the right to take water from the two springs which are the source of plaintiffs' water supply, and to convey said water across Moore's land, Gardner agreeing to pay Moore $1.00 a year for such water and the right of way for the pipe line; and that after this agreement Gardner placed the settling box, pipes and pipe lines on the lands of Moore, and that Gardner and then Thompson paid this $1.00 per year in advance from 1922 to 1935. But we are unable to find any evidence of any such agreement, nor does the evidence show under what circumstances or on what conditions the use of the water claimed by plaintiffs was begun. Appellants called Edward Moore, son of James Moore the original grantee from Ruth Grigsby, who testified as to the payment of the $1.00 per year; but Moore said he did not know who first made arrangements about the pipe line and he gave no testimony as to what the arrangements were. He said that Gardner put in the water system in July, 1922, and gave them $1.00 per year thereafter, as did Thompson up to 1935; but that in December, 1935, Thompson told him that he claimed to own the water and would no longer pay anything to the Moores, and that he never paid anything thereafter.

■ Appellants next argue that though Thompson in December, 1935, claimed the water as his own, and did not thereafter pay the $1.00 per year to Moore, five years did not elapse thereafter before defendant Simonds disputed plaintiffs' rights and interrupted their use of the water. Whether plaintiffs used the water for the full prescriptive period after disclaiming any right of the Moores thereto presented a question of fact which the trial court has found against defendants. Its findings, we think, are supported by the evidence. Both Thompson and Moore testified that in December, 1935, Thomp-

son claimed to own the water right by reason of his deed, asserted that the Moores did not own the water, and told them that if they interfered with his use they would have to establish their rights in court; and that he would not, and did not, thereafter pay anything to the Moores. Thompson also testified that thereafter he used the water without any interruption by Moore or anyone else until defendants interrupted his use in 1942; and Moore also testified that plaintiffs continued to use the water as they had used it, and that he never had any dispute with them about it. As to when defendant Simonds first interrupted plaintiffs' use of the water Thompson testified that it was not until 1942, and that he immediately objected; and though Simonds testified that he went upon the property before he received his deed on December 15, 1941, and did certain work in and around the springs, and that shortly after he bought the property Thompson came up and told him not to interfere with the water as it was his (Thompson's), he did not cut the water off until July or August, 1942; and insofar as there is a conflict in this evidence the trial court has resolved it in favor of plaintiffs, and its finding is conclusive on this appeal.

█ As to appellants' argument that plaintiffs did not make a sufficient showing to support a title by adverse possession because they did not prove exclusive and uninterrupted use, though defendants' answer concedes that the use was made "openly, notoriously and continuously" their argument is that the springs were not fenced and that the water thereof was used by animals pastured on the land, and by a *tenant* of Moore who had a cabin on the land near the springs. But the evidence as to animals pastured on the land shows that such use was only occasional, and it does not show that such animals took water from the two springs, as there was other water on the premises. The Moores never lived on the land, and while a woodcutter, who was cutting under a stumpage agreement with Moore and not as his tenant, lived there at one time in a small hut that he put up, and used some water which he dipped from plaintiffs' box, Thompson testified that this was with his consent as the woodchopper came to see him about it.

█ As for appellants' argument that the injunction provisions of the decree are too broad, these provisions are to be given a common sense construction and so construed do no more than authorize plaintiffs to restore their water system

and maintain it in substantially the same condition in which it was maintained prior to defendants' interference therewith; and the judgment specifically describes the two springs, the settling box and the pipe lines as "the two springs, settling box and pipe line continuously used and maintained by the plaintiffs . . . for more than ten years prior to December, 1941, and which plaintiffs were using when defendants first entered upon the property now owned by them."

Coming now to appellants' complaint regarding the amount awarded to plaintiffs as damages, it is not entirely clear to us what appellants' contentions are in this regard. In their opening brief they apparently contend that plaintiffs did not submit evidence that some particular property of theirs of a specific value was destroyed, so that the trial court could find with mathematical certainty that plaintiffs suffered loss in a specific sum. But in their closing brief they seem to contend that plaintiffs suffered no damage of any kind, or at most they should have been allowed no more than what it would cost to restore their pipe line to its original condition before appellants interfered with same.

It does not appear that appellants ever sought to have plaintiffs segregate their damages, or requested the trial court to segregate them. They did move for a new trial, one of the grounds of said motion being that the damages were excessive and without sufficient support in the evidence. The trial court denied the motion and in its order of denial, after citing cases, stated: "So in the instant case, the plaintiffs are claiming damages for the interference with their free use of their land in having their water supply disrupted periodically, objectionable mineral elements injected into it, and its pollution by diversion through a horse trough, and finally complete severance and disruption of the pipe line through which the ordinary supply of water had been maintained. These are elements of injury from which damages naturally flow, but the exact measure of which is difficult to ascertain. For the injury existing, compensation must be provided and in such case, under the authorities heretofore cited, recovery may be had under the general allegation of damage." Cases cited were *Cederberg* v. *Robison,* 100 Cal. 93 [34 P. 625]; *Lindemann* v. *San Joaquin Cotton Oil Co.,* 5 Cal.2d 480, 494 [55 P.2d 870]; *People* v. *Miller,* 41 Cal.App.2d 252, 258 [106 P.2d 239]; *People* v. *Broome,* 120 Cal.App. 267, 273 [7 P.2d

757] ; *Coleman* v. *Le Franc,* 137 Cal. 214 [69 P. 1011] ; *Storrs* v. *Los Angeles Traction Co.,* 134 Cal. 91, 94 [66 P. 72] ; *Butler* v. *Ashworth,* 102 Cal. 663 [36 P. 922] ; *Shepard* v. *Milwaukee Gas Light Co.,* 15 Wis. 318 [82 Am.Dec. 679] ; *Ives* v. *Humphreys,* (N.Y.) 1 E. D. Smith, 196, 201; *Kentucky Heating Co.* v. *Hood,* 133 Ky. 383 [118 S.W. 337, 134 Am.St.Rep. 457, 22 L.R.A.N.S. 588] ; *Baltimore & Potomac R. R. Co.* v. *Fifth Baptist Church,* 108 U.S. 317 [2 S.Ct. 719, 27 L. Ed. 739] ; *Dunlap* v. *Loup River Public Power Dist.,* 136 Neb. 11 [284 N.W. 742, 124 A.L.R. 400] ; also 8 Ruling Case Law, 479 ; Sutherland on Damages, volume 1, section 16. The gist of these decisions is that jurors, and a trial judge as well, may use their personal experiences and knowledge in arriving at the amount of damages to be awarded under the facts of a particular case, and that damages may be awarded for pain, anxiety, inconvenience, annoyance, interference with the comfort of plaintiff and his family, and disadvantage suffered by reason of a defendant's acts. Also, see, *LeBrun* v. *Richards,* 210 Cal. 308, 320 [291 P. 825, 72 A.L.R. 336], and *Judson* v. *Los Angeles Suburban Gas Co.,* 157 Cal. 168, 172 [106 P. 581, 21 Ann.Cas. 1247, 26 L.R.A.N.S. 183], where it is said that as to such elements of damage the amount of compensation is not susceptible of proof in dollars and cents, but must be left to the sound discretion of a trial court, to be ascertained and adjudged after consideration of all the facts and circumstances established by the evidence in the case.

 The amount of damages to be awarded in a particular case is ordinarily a question of fact, entirely within the province of a jury, or, in the absence of a jury, of a trial court, especially where the law furnishes no rule for their admeasurement (8 Cal.Jur. 877-878, § 129 ; *Aldrich* v. *Palmer,* 24 Cal. 513, 516, cited in *Moore* v. *Levy,* 128 Cal.App. 687, 691-692 [18 P.2d 362], and *Mudrick* v. *Market Street Ry. Co.,* 11 Cal.2d 724, 735 [81 P.2d 950, 118 A.L.R. 533] ) ; and it is only where a verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment, that a court is at liberty to interpose its judgment against that of a jury ; and this rule applies equally to the findings of a trial court when considered on appeal. (*Martin* v. *Shea,* 182 Cal. 130, 139-140 [187 P. 23] ; *Ware* v. *McPherson,* 213 Cal. 120, 121 [1 P.2d 433] ; *Davidson* v. *De Sousa,* 20

Cal.App.2d 311, 315 [66 P.2d 740]; *Mahar* v. *MacKay*, 55 Cal.App.2d 869, 878 [132 P.2d 42].)

In *Cederberg* v. *Robison, supra,* the court said, at page 99, that it is not sufficient for an appellant to say that a jury might have found otherwise as to the amount of damages awarded, or that a verdict for a lesser amount would have been consistent with the evidence; but that it must appear from the evidence that the verdict cannot be sustained.

■ Here the evidence shows that plaintiffs used the water for domestic purposes and also for washing a prune crop grown on their land; that defendants not only changed a portion of plaintiffs' pipe line but that at times they totally disrupted plaintiffs' use; that they diverted the water through a horse trough on their premises, and diverted into plaintiffs' pipe line the flow of water from an iron spring which colored the water so that it stained clothes washed in it as well as the fixtures in plaintiffs' home, and that some ingredient in the water of the iron spring so clogged plaintiffs' pipe lines that water would not run through them. It further appears that defendant William K. Simonds told plaintiff Thompson not to set foot on his land or he would kill him; and that even after a restraining order had been issued by the trial court defendants persisted in interfering with plaintiffs' rights to such an extent that plaintiffs had to resort to a contempt proceeding to secure relief. Under these circumstances we cannot say that the $1,000 awarded plaintiffs by way of damages was excessive.

The judgment is affirmed.

Peek, J., and Thompson, J., concurred.