# CHARLESTON.

CHESAPEAKE & POTOMAC TELEPHONE CO. *v.* RED JACKET CONSOLIDATED COAL & COKE CO.

Submitted March 20, 1923.    Decided January 22, 1924.

1.    EMINENT DOMAIN—*Danger Depreciating Value of Land Not Taken Must be Real and Imminent to be Element of Damage.*

   In ascertaining damages to a landowner arising from the taking of an easement or right of way through his land, an element of damages is any danger that depreciates the value

of the residue of the land resulting from the operation of the condemnor thereon, but such danger must be real, imminent and reasonably to be apprehended, and not remote or merely possible. (p. 409).

2. SAME—*Where Easement Taken for Maintenance of Telegraph and Telephone Lines Certain Remote and Possible Risks Therefrom Held to be Excluded in Determining Damages.*

A coal company over whose land a telephone company has condemned an easement or right of way for the construction and maintenance of telephone and telegraph lines, is not entitled to recover as damages the extra cost of unusual safety appliances in the future construction of high tension electric lines over or across the telephone lines, especially where, as in this case, the record shows that the coal company is negotiating with a power company for the construction of such lines, and the evidence shows that such company uses the highest type of construction, and there is only a remote or possible danger from falling wires; nor is such coal company in such action entitled to recover a sum sufficient to yield annually the premium on an insurance policy to indemnify it against liability for injury to persons or property from contract between the telephone and power lines. (p. 408).

Error to Circuit Court, Mingo County.

Action by the Chesapeake & Potomac Telephone Company against the Red Jacket Consolidated Coal & Coke Company. Judgment for defendant, and plaintiff brings error.

*Judgment reversed; new trial awarded.*

*Dozier A. De Vane, Okey P. Keadle,* and *Goodykoontz, Scherr & Slaven,* for plaintiff in error.
*Bias & Chafin,* for defendant in error.

MILLER, JUDGE:

Pursuant to chapter 42 of the Code, the plaintiff, a public service corporation, instituted in the circuit court of Mingo County, West Virginia, condemnation proceedings to take an estate less than a fee,—an easement or right of way,— over and across a tract of land owned by the defendant corporation, to be used in the erection and maintenance of a telephone and telegraph line. Commissioners were selected

and appointed according to law, who reported to the circuit court that they were of opinion that the sum of $200.00 would be a just compensation for the easement or right of way proposed to be taken, "in, on, over, through and across the said real estate for the purpose of erecting thereon poles, wires, fixtures, crossarms and cables to be used as and for a telegraph and telephone line for public use, and which shall include the right to add to the number of said poles, wires, fixtures, crossarms and cables, to inspect, remove, operate and otherwise use the same for the purposes mentioned, together with the right to cut and remove such timber and growing trees, and overhanging branches which may at any time endanger the safety of the said line; but with the right to the owners, their agents, employees, lessees and tenants to use the said land in such manner as they or either of them may desire, provided that they shall not interfere with, or molest the said applicant in its use of the said line by its officers, agents, employees, lessees and assigns for the purpose and in the manner hereinabove and in said petition specified. * * * As well as for any damages to the residue of said real estate beyond the peculiar benefits which will be derived in respect to such residue from the work to be constructed, after taking into consideration the actual damage that may or will be done to the fee by the construction proposed to be placed thereon." The description in the notice, petition, orders and in the report of the commissioners is a survey, by courses and distances, of the middle line of the right of way proposed to be taken, 9567 feet in length; but the width thereof is not mentioned therein, nor in the later verdict of the jury. The defendant excepted to the report of the commissioners and demanded a jury trial to ascertain the amount of damages to which it was entitled. Upon the trial, the jury found damages in the amount of $3,000.00, their verdict following the language of the report of the commissioners, for a description of the estate to be taken and the rights and duties of the parties thereunder. From a judgment for the amount of the verdict, the plaintiff has appealed.

The errors assigned relate to the trial court's rulings on

instructions offered by the parties and on evidence admitted on behalf of the defendant.

Defendant's theory is that it is entitled to damages; (1) for the value of the estate taken; (2) for the increased cost of constructing high tension electric lines across and over plaintiff's telephone lines, in order to protect itself from damages for injury to persons or property in case an electric wire should break and fall upon the telephone lines; (3) in an amount sufficient to enable it to carry indemnity insurance against such accidents; (4) for the possible danger of fire to the company's own houses and that part of the co-insurance that the company has to carry.

There is no contention as to the right of defendant to recover damages for the part of the land actually used by plaintiff in the erection and maintenance of its lines. The evidence of the value of this land is conflicting, and the jury no doubt based a part of the damages found on that evidence. How much, we do not know. At the time of the trial the line had been constructed and was being maintained and used by plaintiff. The evidence shows that ten foot crossarms are now in use, and that a ten foot strip through the land contains about 2.2 acres. At the highest estimate of the value of the fee, this element of damages would not equal anything near the amount of the verdict. The question then is, to what extent, if any, is the residue of the property depreciated by the occupation and use of the right of way by plaintiff?

It appears that the right of way follows the low land and water courses through the coal company's property. To what extent the land owned and occupied by defendant on both or either side of the right of way has already been developed in the production of coal is not shown; but Mr. Cummings, general superintendent in charge of production for the defendant company, testifies that the company has large veins of coal along both sides of plaintiff's right of way; and it appears from his evidence that production has up to this time been confined to one side. He says: "Now, there is coal on both sides of this line," referring to a map of the right of way, "and the Alma seam is not yet touched. We have plans under way now to open the Alma seam, which

would put a plant in at this point, on this side of the creek. While we have no present plans developed for improvement, that unquestionably will be mined, the seams on this side." He says that in the development of the coal on that side of the right of way, it will be necessary to cross the telephone lines a number of times with high tension electric wires, and that in order to protect the coal company from damages by the falling of electric lines on the lines of the telephone company it will have to expend large sums of money in the construction of extra appliances at the crossing points; that the amount of the additional expenditure will depend on "the number of crossings. Of course we can not anticipate how many times that would be crossed." When asked how many times, in his opinion, in the course of years, it would be necessary to cross the telephone line, he said: "Why, twenty times at $150.00 a crossing is the figures I used on that." As to who would install the lines contemplated, Cummings said: "That depends on whether we furnish the current or buy the current from the Kentucky and West Virginia Power Company, whether we make it or whether we buy it. If the power company furnishes us with power, part of those lines will be built at our cost and part at theirs. That is a matter of agreement. Of course you understand they will deliver the current to a certain point, at which point it goes through a meter, and they charge us with it from that meter, and the distribution is by us, and we build our own lines." M. C. Funk, district manager of the Kentucky & West Virginia Power Company, testified that it would cost three hundred dollars to put in the extra construction at each crossing, that is, netting under the electric lines, or dead end construction; but he says this is not usual; that "we have never taken any (extra precaution) because it was never a question. We are very careful to put up as substantial construction as possible over such crossings." He says the danger is to a certain extent pretty remote, a possibility but not a probability; that the falling of wires is ordinarily caused by trees being blown down; but that his company maintains regular patrolmen along its lines. M. W. Gilliam, an electrical engineer, and district manager of the West Virginia Enginering Company,

consulting engineer for the defendant company, testifies that
there is a possibility of any wire breaking at any time, espe-
cially during the time of sleet. He would recommend the
reducing of crossings and such construction as would reduce
the chances of breaking to a minimum. He says that the
additional cost would amount to one hundred and fifty
dollars at each crossing; but does not know of any case where
this special construction has come up relative to crossing the
trunk lines of the Chesapeake & Potomac Telephone Com-
pany; and says that, ''The Kentucky & West Virginia Power
Company's construction is rather a high standard and all of
it is constructed with all due safety taken into consideration.''
Asked if he would consider the danger of the high tension
wire falling on the telephone wire an imminent danger, or
a remote or a mere possible danger, he answered: ''I consider
it a possible danger.''

To render the defendant company liable in damages for
injuries the result of the falling of high tension wires across
the telephone company's lines, there must be evidence of
negligence on its part. If the defendant company should
construct and maintain deficient or insufficient lines over its
premises, it would be liable to anyone injured thereby as well
as to the plaintiff company or anyone coming in contact with
the latter's lines; and it is not to be presumed that the coal
company would, regardless of whether or not the telephone
company's lines extended across its premises, maintain faulty
construction. If so, it would itself be liable. On the other
hand, should it contract with the Kentucky & West Virginia
Power Company for its supply of electric current, of which
there is some evidence of negotiations, the proof is that that
company uses a high standard and substantial construction,
and that there is little probability of poles or lines falling,
which ordinarily occurs when trees are blown across the lines,
and such danger is eliminated to a great extent by cutting
down all timber liable to fall on the lines or poles; and in
this case the right of way or easement includes the right to
cut and remove all such timber, in so far as the telephone
company is concerned, and it is not unlikely that for its own
protection it will keep its right of way, as well as the pro-

posed crossing points, clear of all timber that might endanger its lines. There is no evidence in this case that any more substantial construction is used in the vicinity of defendant's property, or in the coal fields of West Virginia generally, than that used by the power company or proposed to be used by the coal company, as described in the evidence adduced on the trial. All that appears is what was said by Gilliam, that railroads require special construction across their lines; but he does not say that telephone companies require extra precautions. So whether the defendant company constructs its own line, or it is built by the power company, neither of them would be justified in building a structure not reasonably safe and of the high class which both the power company's agent and the expert electrical engineer say it is the custom of that company to maintain. With this character of construction, would not all damages liable to occur be adequately covered, and would not every element of such damages as defendant contends for be problematical and too remote to be measured by a jury? If they are, the condemnor in this case can not be held liable for the cost of providing against such speculative and remote damages, nor for the cost of a more expensive and higher class of construction.

To provide against this remote and possible risk, the defendant company claims damages in the amount of $3,000.00, contending that it will be necessary in the immediate future or during the operation of mining its coal from the three thousand acre tract, to cross and re-cross the telephone company's line some twenty times, and that the extra expense of construction at each crossing will be at least $150.00.

The commissioners appointed to assess damages evidently allowed nothing for these remote and speculative damages. One of them in his testimony says: "I simply figured that there was a possibility there, although not a probability that it would happen." Another says: "We thought it remote." And another: "Being rather remote, we figured that it would be taken care of later, whatever might arise." These witnesses say that the commissioners had this question under consideration. One of the main witnesses for defendant, a bank cashier and man of affairs, and a stockholder in a company

owning property adjoining that of defendant through which the telephone line also ran, testified that in view of the fact that defendant had the use of the land, except for the right of the telephone company to go on the premises in maintaining their line, he did not consider the damage very much, ''I would say two hundred dollars.''

Defendant contends that in order to indemnify it against damages, it will be necessary to carry a ten thousand dollar insurance policy, at a cost of one hundred dollars per year; and for that purpose includes in its claim an item for $1,-666.66. which at six per cent interest will yield the one hundred dollars annually. This evidence went to the jury. It will be noted that this amount was to be collected from plaintiff at once, to become a permanent investment, the returns from which would be realized after all operations on the land had ceased. Under our holding that damages accruing from injuries sustained by reason of falling wires are too speculative and remote to be considered, this evidence was improper.

The rulings of the trial court on the admission of evidence and on the instructions given at the instance of defendant show that the court was of opinion that the damages which we have here designated as remote and speculative, were recoverable in this case.

It seems to us that we need not go outside of our own decisions in laying down the rules governing damages in cases like this. We have held that in such cases dangers which lessen the value of the residue of the land may be considered in the ascertainment of damages; but that such dangers must be real, imminent and reasonable to be apprehended,—not remote or merely possible. *Kay* v. *Railroad Company,* 47 W. Va. 467; *Railway Company* v. *Shepherd,* 26 W. Va. 672; *Power Company* v. *Brotherton,* 90 W. Va. 155. And we recently held, in a case where plaintiff's action was against an electrical power company which had strung a high tension wire along a street adjoining her premises, that the damages which might occur were too speculative and remote to support such action. *Karcher* v. *Wheeling Electrical Company,* 118 S. E. 154.

In summing up the various items which go to make up the amount of damages claimed by defendant, its general superintendent Cummings says: "In addition to that, of course, is the possible danger of fire to our own houses and that part of the co-insurance that the company has to carry in case of fire loss, and that we estimate would run, roughly, from four to five hundred dollars." The evidence shows that defendant owns a number of miner's houses along both sides of the right of way in question, in which there is telephone and electric light service; but the telephone wires are in no way connected with plaintiff's lines on the right of way, though since the construction of plaintiff's line the coal company's local line has been removed to plaintiff's new poles, by whom the evidence does not show; but Superintendent Cummings says that plaintiff's line is a trunk line and does not serve the coal company's camp. If the proposed high tension lines are constructed across defendant's property or across these local service lines, would not defendant have to protect itself against loss by fire or injury to its employees regardless of the presence of the telephone company's lines? Besides, the evidence on this question of damage to defendant's houses is very meager and vague. The witness does not say what extra premium defendant will have to pay annually for the alleged additional fire risk. He does not say what the "four or five hundred dollars" covers, whether an amount necessary to produce at interest the extra premium as in the case of the $1,666.66, or an amount sufficient to replace property that may be damaged by fire.

What we have said on the several questions raised and disposed of, covers the assignments of error relating to the trial court's rulings on the admission of evidence and on the giving and refusing of instructions to the jury.

We are of opinion to reverse the judgment, set aside the verdict of the jury, and remand the case to the circuit court for a new trial.

*Judgment reversed; new trial awarded.*