(631 P.2d 268)
No. 51,217

DONALD F. WILLSEY and MARJORIE L. WILLSEY, *Plaintiffs-Appellees,* v. KANSAS CITY POWER & LIGHT COMPANY, *Defendant-Appellant.*

Petition for review denied September 25, 1981.

Opinion filed July 17, 1981.

*Lowell L. Smithson,* of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, and *H. Thomas Payne,* of Payne & Jones, Chartered, of Olathe, for appellant.

*L. D. McDonald, Jr.,* of McDonald & Dykes, of Overland Park, for appellees.

BeforeFOTH,. C.J., PARKS and SWINEHART, JJ.

FOTH,C.J.: Kansas City Power and Light Company appeals from a $39,300 judgment awarded by a jury to the landowners in an easement condemnation proceeding. The primary issue is whether the trial court erred in permitting the jury to consider expert valuation testimony based in part on the impact on market value of "buyer resistance" based on popular fear of high-voltage electric transmission lines.

Donald and Marjorie Willsey owned an undeveloped 75-acre tract of land near Lenexa, in Johnson County. It was an east-west 80, less the southeast five acres, with its shortened eastern side fronting Renner Road a quarter mile south of 95th Street, at about 98th Street. It was agreed that its highest and best use was to hold for future development of an unspecified nature. As of June 1, 1976, KCPL condemned a 90-foot easement running diagonally from a point near the southwest corner to a point 465 feet west of the northeast corner, virtually bisecting the tract. On the easement, which covered just over five acres, it was to erect up to five "H" frame metal towers supporting a 161,000-volt power line. The court-appointed appraisers awarded damages of $25,650 which KCPL paid into court. The Willseys appealed to the district court.

At trial, testimony was adduced from the landowner and from two expert appraisers on each side as to value of the tract before and after the taking:

| | Before | Per Acre | After | Damages |
|---|---|---|---|---|
| For Landowners: | | | | |
| Don Willsey (landowner) | 750,000 | (10,000) | 550,000 | 200,000 |
| Rogers McCrae | 438,300 | (5,844) | 384,250 | 54,050 |
| Rex Vickers | 562,500 | (7,500) | 491,100 | 71,400 |
| For KCPL: | | | | |
| Curtis Bliss | 434,000 | (5,786.57) | 417,000 | 17,000 |
| Jack Forbes | 431,250 | (5,750) | 416,600 | 14,650 |
| Jury Verdict: | 466,500 | (6,220) | 427,200 | 39,300 |

As may be seen, the verdict was well within the bounds of the expert testimony.

Although KCPL also cites other references during trial to the alleged fear of power lines, the main focus of its complaint is on the testimony of the landowners' expert, Rex Vickers. After qualifying as a market analyst, realtor and appraiser, Vickers gave his opinion on before and after values. This was followed by a hearing out of the jury's presence to secure a ruling on the admissibility of his proposed testimony on the effect of the fear of power lines on market value. The court's ruling, in essence was:

"[I]f Mr. Vickers in good faith and in good conscience really and truly believes that the fear of electrical transmission lines affects the market, I will assure you he is going to be entitled to state that proposition. Now, if he starts putting on some sort of a song and dance and you are going to start using Newsweek magazine articles in trying to give corroboration to the substance of that part of his opinion, et cetera, et cetera, et cetera, I will simply declare he is not an expert, I will strike his testimony from the record.

. . . .

"I am going to allow the Power and Light Company to do their song and dance that nobody pays any attention to them at all and compare comparables proving that the market doesn't recognize any detriment. I am going to allow landowner to prove that it does provide a detriment both in the development and in the desirability factor of the [multitude] of potential buyers."

Thereafter, in the presence of the jury, Vickers described the features of the land which contributed to and detracted from its value without the easement, and the effect on value of the presence of the easement. After he had listed and described a number of adverse factors he perceived, the critical exchange took place:

"Q. What, if any problem in the buyer market resistance, if you would, is there to building a home near high power wires or developing industrially near high power wires?

"A. Well, there is a certain amount of buyer resistance to high power or high voltage overhead lines.

"Q. Why?

"A. I would say people—there is a number of things. Number One, people don't like the unsightliness of it, and then, of course, there is a latent fear."

[Motion to strike, overruled.]

"Q. Proceed, Mr. Vickers.

"A. There is a latent fear on the part of buyers due to this high voltage power line. This is due in part to some people, it may be imagined, and it may be due to what they see in the papers, on T.V. and hear on the radio—

. . . .

"Q. Mr. Vickers, have you seen any advertisements relative to this you are talking about?

"MR. PAYNE: The same objection, Your Honor. This goes clear beyond

the scope. Clear outside the realm; speculative things he may have seen; hearsay.

. . . .

"THE COURT: If the witness is indulging in remote and speculative, fanciful, conjectural considerations, obviously his expert opinion is not much value and he would be subject to cross-examination. Whatever it is that gives him his valuation opinion he can testify about it. Objection overruled.

"Q. Mr. Vickers, have you personally seen advertisements in the news media concerning danger of power lines, and proximity to power lines?

"A. Well, the Kansas City Power and Light Company itself is probably the one who propagates or who informs the public of the danger of getting in contact or close proximity to power lines. Yes, sir, I have seen it, I have seen the thing about, 'Don't fly a kite, don't get your model airplanes in the line, don't get a ladder close to these lines.' Many other things of this nature.

"Q. Mr. Vickers, have you in your experience as a real estate broker in talking to actual buyers in the pit, have those buyers expressed concerns to what you are relating to right now, to you as a realtor?

"A. Absolutely."

At that point, when the testimony was about to turn to other damage factors and to comparable sales, KCPL renewed its motion to strike and, when that was overruled, moved for a mistrial. The mistrial motion was likewise overruled and the trial proceeded.

As may be seen, the expert's opinion was that public fear of high-voltage lines affects the market value of land over which such lines pass. His further opinion was that such fear was engendered in part by advertisements warning the public of the dangers of high voltage lines, propagated by electric utilities in general and KCPL in particular. His opinion as to the existence of the fear and its source was based on his personal dealings with potential land buyers. The trial court's ruling that the testimony was admissible was based on the following reasoning: The witness was a conceded expert who was entitled to express his opinion; the factors on which that opinion was based went only to its weight and not admissibility; only if those factors went beyond his knowledge and expertise would his testimony be stricken; because the opinion was based on personal observation and experience in the market place it was admissible for such weight as the jury might choose to give it.

This rationale represents a distillation of rules derived from recent cases on expert testimony, notably *City of Bonner Springs v. Coleman*, 206 Kan. 689, 481 P.2d 950 (1971) and *Morgan v. City of Overland Park*, 207 Kan. 188, 483 P.2d 1079 (1971). In

*Coleman* it was held that a valuation expert could properly take capitalization of income from the property into account in forming his opinion of value, but that it was error to submit income figures directly to the jury. The reason for so holding was said to be:

"A naked statement of gross income is too uncertain and depends upon too many speculations and contingencies to safely be accepted as evidence of the usable value of property upon which a business is carried on." 206 Kan. at 694.

In explaining why an expert may consider factors which were "uncertain" and fraught with "speculations and contingencies" while a jury may not, the court observed:

"It must also be understood that once a witness has qualified as an expert, a court cannot regulate the factors he uses or the mental process by which he arrives at his conclusion. These matters can only be challenged by cross-examination testing the witness' credibility.

"An expert witness may take the gross profit from a business and reduce it to rent and then capitalize the rent for the purpose of arriving at the value of the property on which the business is located. However, it is to be expected that the expert will be well enough informed that he will recognize the uncertainties and contingencies and eliminate them or make proper allowances." 206 Kan. at 695.

In *Morgan*, over the dissent of Justices Fontron and Fromme, the first paragraph of the above quotation was promoted to syllabus status. 207 Kan. 188, Syl. ¶ 2. In that case, the issue was the admissibility of direct evidence of the comparable sales relied on by the expert. The court held them admissible, saying:

"The expert's opinion of value is the primary evidence under submission to the jury. Sales of comparable properties are offered in condemnation cases more often as *supportive of the reasoning* by which the expert arrives at his opinion *rather than a direct indicia* of value." (Emphasis added.) 207 Kan. at 190.

The court then went on to add a caveat to the general rule of *Coleman:*

"It must also be understood, however, that the responsibility of defining the extent of compensable rights is in the courts and if it is established that value testimony was based on noncompensable items or the credibility of the testimony is otherwise destroyed the testimony should be stricken in response to a proper motion." 207 Kan. at 190.

The issue then becomes whether public fear of high-voltage electric lines which, in the opinion of an expert, reduces market value is nevertheless a "noncompensable" item so that the opinion which takes it into account must be stricken.

On this issue there are currently prevalent three judicial ap-

proaches, categorized by one court as the "majority" rule, the "intermediate" rule, and the "minority" rule. *Casey v. Florida Power Corporation,* 157 So. 2d 168 (Fla. Dist. Ct. App. 1963). Our own survey of the cases convinces us that this description is inaccurate, and we therefore prefer to designate them numerically.

The first, the so-called "majority" rule, is represented by the leading case of *Alabama Power Company v. Keystone Lime Company,* 191 Ala. 58, 67 So. 833 (1914), where the court reasoned:

"If it be true that some people who have not grown accustomed to lines similar to that of appellant are afraid of this improvement, and that therefore they are not now willing to buy appellee's lands, the law can furnish to appellee no remedy therefor, and cannot regard depreciation created by such a cause as resting upon any substantial basis. . . . In allowing compensation, however, it cannot allow any compensation *on account of any claimed depreciation of such remaining land which is due to the mere fears of some of the people, which are founded in reality upon their lack of knowledge of the real effect of the line, and which human experience shows is not justified by the facts."* (Emphasis added.) 191 Ala. at 71-72.

The second or "intermediate" rule is summarized in *Dunlap v. Loup River Public Power District,* 136 Neb. 11, 284 N. W. 742 (1939). The jury there was instructed to find the value of the farm before and after the taking and to include in their consideration "every element of annoyance, inconvenience, danger and disadvantage resulting from the construction and maintenance of the line which would influence an intending purchaser's estimate of the market value of such property, including danger from the transmission lines, if any." In approving this instruction, the court observed:

"Mere general fears from the presence of a transmission line cannot be made the basis upon which to predicate any depreciation in market value, for ill-defined fear that at some unknown time in the future some misfortune may come to man or beast by reason of the transmission line cannot enter into the consideration of those who are required to fix the amount of damages. But, on the other hand, *if such fears be reasonable, not speculative nor ill-defined, but founded on practical experience,* and if such fears are entertained so generally as to enter into the calculations of all who propose to buy or sell, can it logically be said that they do not depreciate the market value of property? If an owner cannot sell his property at as good a figure with this line across it as he could before, then his land may be depreciated on account thereof. See *Kentucky Hydro-Electric Co. v. Woodard,* 216 Ky. 618, 287 S. W. 985; 10 R. C. L. 156, sec. 137; *St. Louis, E. R. & W. R. Co. v. Oliver,* 17 Okla. 589, 87 Pac. 423, 10 Ann. Cas. 748; *Illinois Power & Light*

*Corporation v. Peterson*, 322 Ill. 342, 153 N. W. 577, 49 A. L. R. 692." (Emphasis added.) 136 Neb. at 17-18.

Finally, what the Florida court termed the "minority" rule is exemplified by *Hicks v. United States,* 266 F.2d 515 (6th Cir. 1959). The court there commented:

"The apprehension of injuries to person or property by the presence of power lines on the property *is founded on practical experience* and may be taken into consideration *in so far as the lines and towers affect the market value of the land.* Kentucky Hydro-Electric Company v. Woodard, 216 Ky. 618, 287 S. W. 985; Oklahoma Gas & Electric Company v. Kelly, 177 Okl. 206, 58 P.2d 328." (Emphasis added.) 266 F.2d at 521.

The three views may thus be summarized as follows: The first holds that fear of danger from power lines is necessarily based on pure speculation by an ignorant public and can never be an element of damages even if it affects the market value of the land. The second holds that, while conjectural damages are noncompensable, if the fear is *shown to be reasonable* (or at least not wholly unreasonable) and in fact affects market value, the loss *is* compensable. The third holds that the dangerous nature of power lines is a fact proven by common experience, and that the impact of public fear of such danger on market value may be shown and compensated *without independent proof* of the reasonableness of that fear.

As previously indicated, our research indicates that the "majority-minority" label applied in Florida is a misnomer. Some decisions are concededly difficult to classify. Nevertheless, we find only four states which, following the "majority" rule, reject evidence of fear of danger even though it affects market value:

Alabama: *Alabama Power Company v. Keystone Lime Company,* 191 Ala. 58, 67 So. 833 (1914).

Florida: *Casey v. Florida Power Corporation,* 157 So. 2d 168 (Fla. Dist. Ct. App. 1963).

Illinois: *Central Ill. Light Co. v. Nierstheimer,* 26 Ill. 2d 136, 185 N.E.2d 841 (1962); *Illinois Power & Light Corp. v. Peterson,* 322 Ill. 342, 153 N. E. 577, 49 A.L.R. 692 (1926).

West Virginia: *Telephone Co. v. Coal and Coke Co.,* 95 W. Va. 406, 121 S. E. 278 (1924).

On the other hand, eleven states apparently follow the third, "minority," rule, admitting such evidence routinely on a simple showing that the fear of danger exists and affects market value;

the "reasonableness" of the fear is either assumed or is deemed irrelevant:

Arkansas: *Ark. Power & Light Co. v. Haskins,* 258 Ark. 698, 528 S.W.2d 407 (1975).

California: *Pac. Gas etc. Co. v. W. H. Hunt Estate Co.,* 49 Cal. 2d 565, 319 P.2d 1044 (1957).

Indiana: *Southern Ind. Gas & Electric Co. v. Gerhardt,* 241 Ind. 389, 172 N.E.2d 204 (1961).

Iowa: *Evans v. Iowa So. Util. Co.,* 205 Iowa 283, 218 N. W. 66 (1928) (see also *Fanning v. Mapco, Inc.,* 181 N.W.2d 190, 197 [Iowa 1970] holding newspaper accounts of danger from pipelines, published in the community where the right of way was condemned, admissible to show their adverse effect on market value).

Louisiana: *Claiborne Elec. Cooperative, Inc. v. Garrett,* 357 So. 2d 1251 (La. App. 1978).

North Carolina: *Colvard v. Light Co.,* 204 N. C. 97, 167 S. E. 472 (1933).

Ohio: *Ohio Pub. Service Co. v. Dehring,* 34 Ohio App. 532, 172 N. E. 448 (1929).

Oklahoma: *Oklahoma Gas & Electric Co. v. Kelly,* 177 Okla. 206, 58 P.2d 328 (1936).

South Dakota: *Basin Electric Power Cooperative, Inc. v. Cutler,* 88 S. D. 214, 217 N.W.2d 798 (1974).

Virginia: *Appalachian Pr. Co. v. Johnson,* 137 Va. 12, 119 S. E. 253 (1923).

Washington: *State v. Evans,* 26 Wash. App. 251, 612 P.2d 442 (1980).

Added to this list of states is the Sixth Circuit with its vast experience in federal condemnation for Tennessee Valley Authority power lines. Following its unequivocal pronouncement of the third, "minority," approach to the problem in *Hicks v. United States,* quoted above, it had occasion to reevaluate its position against a claim that fears of power lines are groundless. In *United States ex rel T.V.A. v. Easement and Right of Way,* 405 F.2d 305 (6th Cir. 1968), it reaffirmed its prior view, saying:

"Since the *Hicks* case was decided, nearly ten years ago, TVA has conducted numerous safety studies and has concluded from them that apprehension of injuries is not founded on practical experience and should not be considered in awarding incidental damages. The TVA studies conducted on this issue are also creditable. However, in final analysis, *we are concerned only with market value.*

Although these studies may show *objectively the complete safety* of these structures, *we are not convinced that certain segments of the buying public may not remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the property as they otherwise would."* 405 F.2d at 309. (Emphasis added.)

Thus, that court awards compensation for any loss in market value caused by the taking, even if contributed to in part by fears which are totally unfounded by objective standards.

Nine jurisdictions seem to follow the second, intermediate, rule, admitting evidence of the existence of fear and its effect on market value if it is shown that the fear has some reasonable basis:

Connecticut: *Northeastern Gas Transmission Co. v. Tersana Acres, Inc.,* 144 Conn. 509, 134 A.2d 253 (1957) (approving fear as an element of damages on a factual finding of a "general public belief in danger" which was "well founded in fact." Left open was whether it would be proper if the fear were shown to be only "not entirely unreasonable.").

Georgia: *Georgia Power Company v. Sinclair,* 122 Ga. App. 305, 307, 176 S.E.2d 639 (1970).

Kentucky: *Kentucky Hydro-Electric Co. v. Woodard,* 216 Ky. 618, 287 S. W. 985 (1926); *Gulledge v. Texas Gas Transmission Corp.,* 256 S.W.2d 349 (Ky. 1952).

Missouri: *Kamo Electric Cooperative, Inc. v. Cushard,* 416 S.W.2d 646 (Mo. App. 1967); *Phillips Pipe Line Co. v. Ashley,* 605 S.W.2d 514 (Mo. App. 1980).

Nebraska: *Dunlap v. Loup River Public Power District,* 136 Neb. 11, 284 N. W. 742, 124 A.L.R. 400 (1939).

New Jersey: *Tennessee Gas Transmission Co. v. Maze,* 45 N. J. Super. 496, 133 A.2d 28 (1957).

Tennessee: *Hoge v. Southern Cities Power Co.,* 8 Tenn. App. 636 (1928); *Alloway v. Nashville,* 88 Tenn. 510, 13 S. W. 123 (1890).

Texas: *Heddin v. Delhi Gas Pipeline Company,* 522 S.W.2d 886 (Tex. Civ. App. 1975). (But see *Southwestern Public Service Co. v. Vanderburg,* 581 S.W.2d 239 [Tex. Civ. App. 1979], and cases cited at p. 245 therein, indicating that fear of electrocution is a proper element of damages without a showing of reasonableness.)

Utah: *Power Co. v. Bruneau,* 41 Utah 4, 125 Pac. 399 (1912).

In Kansas we have had just one case in point, relied on by both sides, *Yagel v. Kansas Gas & Electric Co.,* 131 Kan. 267, 291 Pac.

768 (1930). There a 100-foot easement was condemned across that 40 acres of plaintiff's 120-acre farm which lay in the Neosho River bottom and was subject to flooding several times each year. Two towers were erected. As was the custom of the time, the jury was asked to separately consider and evaluate the property taken and each item of damage to the remainder. It valued the 3.24 acres taken at $81, loss of the right to stack crops on the easement at $19, and inconvenience in cultivating around the towers at $100. In answer to special questions it specifically disallowed anything for restrictions on buildings on the easement, unsightliness, crop damage, interference with telephone and radio, possibility of injury because of wires breaking, possibility of injury to children by climbing the towers and coming in contact with the wires, and the possibility of danger from lightning.

The landowner appealed, claiming error in the trial court's refusal to instruct the jury that it should consider:

"The facts and circumstances, if any, showing that his said farm has been made less valuable because of fear in the minds of prospective purchasers of injury to persons or property, if any is likely, from breakage or falling of the high-power wires, if this depreciates the value of the property." 131 Kan. at 270.

The court held the instruction was properly refused. In so doing it first noted that the only evidence on the matter of fear of the wires was (1) the presence of "Danger" signs on each of the two towers and (2) plaintiff's own testimony that *he* was afraid the wires might break in a lightning storm, and *thought* a buyer would feel the same way; he could put no dollar figure on that element of damage.

The trial court there refused to strike the testimony but, like the trial court here, said it would instruct on the proper elements for the jury to consider. The instruction which was given, and approved by the Supreme Court, said the damages " 'must be real, imminent and reasonably to be apprehended; and not remote, speculative or merely possible.' " 131 Kan. at 272. The instruction went on to say:

"The fear of a remote and contingent injury which may possibly occur because of the condemning and appropriation of a right of way across the land of plaintiff by the right of eminent domain herein exercised by defendant, and the maintenance of its transmission line thereon, the happening of which is remote, speculative and uncertain and merely possible, including accidents, action of the elements and acts of God over which defendant has no control, cannot form the basis for allowance of damages in this case, and should not be considered by you in determining the amount of your award." 131 Kan. at. 272.

After approving this instruction, the Supreme Court went on to cite and quote with apparent approval a case applying the "intermediate" rule, *Kentucky Hydro-Electric Co. v. Woodard,* as follows:

"In *Kentucky Hydro-Electric Co. v. Woodard,* 216 Ky. 618, the court rejected ill-defined and speculative fear of electric transmission lines as an element to measure damage to market value of land, adding:

" 'But if such fears be reasonable, not ill-defined but founded on practical experience, and if they be entertained so generally as to enter into the calculations of all who propose to buy or sell, can it logically be said that they do not depreciate the market value of the property? The property owner is to be paid for his actual damage. If he cannot sell his property at as good a figure with this line on it as he could without it by reason of reasonable fears, not speculative, but founded on experience, and entertained by those who wish to buy, has he not been damaged in this regard? It is no fault of his that the line has been erected. Under such assumed state of facts, his land has been depreciated on account of such fear on the part of buyers.' (p. 631.)" 131 Kan. at 272.

As our court went on to note, the evidence in the Kentucky case showed only the personal fears of the witnesses, which were characterized by the Kentucky court as "ill-defined, speculative and unreasonable." The Kentucky court went on to point out,

"Further, these witnesses did not show that this fear, had it been of the proper kind, was so broad that it affected the market value of the property. They testified only that, in their judgment, the land was depreciated in value because of the fear *such witnesses* entertained." 216 Ky. at 636. (Emphasis added.)

In *Yagel* the Kansas court also cited *Appalachian Pr. Co. v. Johnson,* 137 Va. 12, for the proposition that upon a proper showing a condemnation award could properly take into consideration the effect of fear of the line breaking and injuring persons and property, quoting the following excerpt:

" 'Whether due to inherent defects or unavoidable accidents, not to be guarded against by reasonably skillful construction and careful operation (*Alloway v. Nashville,* supra, 88 Tenn. 510, 13 S. W. 123, 8 L. R. A. 123); or perhaps, indeed, even where due to negligent construction or operation, *if the liability to such injury in fact depreciated the market value of the property.* 2 Lewis on Em. Dom., sec. 740 (497); and *Leroy, etc., R. Co. v. Ross,* 40 Kan. 598, 20 Pac. 197, 2 L. R. A. 217, and note.' (p. 31.)" (Emphasis added.) 131 Kan. at 273.

Our court then went on to review *Leroy,* the Kansas case cited by the Virginia court. In that case it was held that in a railroad right-of-way condemnation action danger to stock from trains and danger to crops and improvements from fire were proper elements

of damages, but only to the extent they were shown to affect market value.

From the foregoing it would appear that *Yagel* placed Kansas among those states adopting the "intermediate" rule, if not the "minority." KCPL, however, relies on later discussion in the opinion commencing with:

"On the other hand, the weight of authority clearly holds that the mere fears of people arising from the proximity of an electrical transmission line are not a proper element on which to calculate a depreciation in the market value of land. The supreme court of Alabama went into this question quite thoroughly in *Alabama Power Co. v. Keystone Lime Co.,* 191 Ala. 58, a case on all fours with the one before us, and held—

" 'Where a right of way for the erection or maintenance of towers, poles and wires for the transmission of electricity is condemned, the owner may recover compensation for the actual damages arising from depreciation in the value of his remaining land, caused by the presence of these things upon the right of way; but *mere fears* of people from their presence upon the right of way cannot be made a basis on which to predicate such depreciation or *affect the amount of the recovery.*' (Syl. ¶ 2.)" 131 Kan. at 274. (Emphasis added.)

KCPL reads this passage and the following discussion as a rejection of any consideration of fear on market value. We do not read it so broadly. The element specifically rejected is "mere fears" arising from the presence of a power line. We take this to mean the personal fears of the landowner or other witnesses. Nothing suggests a rejection of generally entertained fears which in fact affect market value. We think it significant that the *Yagel* court, after quoting the landowner's testimony as to his own fear and his supposition as to such fears in others, noted that,

"No evidence more tangible or pertinent in the matter of fear *as affecting the market value* of the farm was offered, . . . ." (Emphasis added.) 131 Kan. at 271.

There can be no quarrel with the proposition that "mere fears" of injury cannot be compensated. That accords with the universal rule against remote, speculative and conjectural damages. If injury should occur at some future time, that would be the occasion to determine whether and to whom there is liability.

Other Kansas cases, as we read them, say no more. In *United Power & Light Corp. v. Murphy,* 135 Kan. 100, 9 P.2d 658 (1932), the court found too remote and speculative "the idea that some prospective purchaser might object to the presence of the transmission line, or the fact that an easement of any character was

across the place, . . . ." 135 Kan. at 108. There was no evidence that widespread fear of power lines affected the market value. In *Schwartz v. Western Power & Gas Co., Inc.*, 208 Kan. 844, 494 P.2d 1113 (1972), it was held sufficient to charge the jury in general terms that its damage consideration should not be speculative, conjectural or remote; it was not necessary to tailor the instruction to specifically exclude possible injury from the line. And in *In re Central Kansas Electric Coop., Inc.*, 224 Kan. 308, 582 P.2d 228 (1978), claimed adverse effects of the line on the landowner's hog raising operation were held improperly admitted. This was in part because of the lack of knowledge or expertise of the witnesses, but basically because the evidence of potential harm to hogs went only to the income approach to damages, whereas the market data approach was held to be the proper test for assessing damages to the quarter section of Kansas farm land there in question.

We therefore regard the question as an open one in this jurisdiction. As we see it, in any condemnation case the objective is to compensate the landowner for damages actually suffered. Remote, speculative and conjectural damages are not to be considered; the owner cannot recover today for an injury to his child which he fears will happen tomorrow. Logic and fairness, however, dictate that any loss of market value proven with a reasonable degree of probability should be compensable, regardless of its source. If no one will buy a residential lot because it has a high voltage line across it, the lot is a total loss even though the owner has the legal right to build a house on it. If buyers can be found, but only at half the value it had before the line was installed, the owner has suffered a 50% loss. If this kind of lost market value is proven to the satisfaction of the jury we see no reason why the landowner should bear the loss rather than the customers for whose benefit the loss is inflicted.

This rationale obviously leads to the third, misnamed "minority" rule, which is the one we prefer. In this case, however, we need not go so far. The facts here meet the test of the "intermediate" rule, which we believe is the most stringent rule which can justifiably be applied against the landowner.

Some courts applying that rule require that the fear must be proven to be both reasonable *and* founded on practical experience. *E.g., Gulledge v. Texas Gas Transmission Corp.,* 256

S.W.2d 349 (Ky. 1952). We think that asks too much; many people entertain perfectly reasonable fears of dangers they have not personally encountered, and which are rarely met in the experience of mankind generally. If the requirement of reasonableness is to be made, we prefer the formulation in *Heddin v. Delhi Gas Pipeline Company,* 522 S.W.2d 886, 888 (Tex. Civ. App. 1975):

"It is clear that compensation for land taken by eminent domain is measured by the market value of the land at the time of the taking. [Citations omitted.] It is equally clear that *fear* in the minds of the buying public on the date of taking is relevant to the proof of damages when the following elements appear:
"1. That there is a basis in reason or experience for the fear;
"2. That such fear enters into the calculations of persons who deal in the buying and selling of similar property; and
"3. Depreciation of market value because of the existence of such fear. [Citations omitted.]
"To establish that there is a basis in reason or experience for the fear, it is incumbent upon the landowners to show either an *actual danger* forming the basis of such fear or that the fear is reasonable, whether or not based upon actual experience. Reduction in market value due to fear of an unfounded danger is not recoverable. [Citations omitted.] This rule is designed to exclude consideration *only of those few situations in which the danger underlying the fear finds its basis in neither reason nor experience but is predicated rather on fancy, delusion or imagination.*" (Some emphasis added, some original.)

The same sort of rule obtains in our neighboring state of Missouri. In *Phillips Pipe Line Co. v. Ashley,* 605 S.W.2d 514 (Mo. App. 1980), the court first recognized the general rule that "any element of damage which results in a diminution on the fair market value of the remainder area is a fact which must be considered." 605 S.W.2d at 517. The court went on to explain the qualification to the general rule:

"Logically, then, a condemnee should recover for a diminution in value resulting from any factor a willing purchaser would consider detrimental to the remaining property, if the detriment were a direct result of the taking. However, in practice, our courts have qualified this general doctrine of damages, and not every factor which may possibly have an effect upon market value is entitled to consideration. Thus, although a partial taking may entail risks in the use of the remainder area, *the risks must be shown to be reasonable probabilities and not imaginary possibilities* before they can be considered as proper elements in computing the diminution in value of the remainder area. [Citations omitted.] These risks are properly considered 'not upon the theory that a recovery is being thereby allowed for speculative risks and contingencies which may never happen, but instead upon the theory that such matters in the nature of special damages affect the present market value of the land in the light of the use to which it may be put.' *Missouri Power & Light Co. v. Creed,* 32 S.W.2d 783, 787 (Mo. App. 1930)." (Emphasis added.) 605 S.W.2d at 517-18.

That case also dealt with the manner of proving the reasonableness of the fears of prospective purchasers—an issue hotly controverted at the trial level here, but only peripherally involved in the issues on appeal. The condemnation there was for a pipeline, and the landowner introduced newspaper clippings of a previous explosion in another pipeline in the same county as part of the basis for fearing the new pipeline. (Here, objection was made to the expert's references to the warning campaigns in newspapers and on television.) The Missouri court dealt with the issue succinctly:

"Phillips also argues that the newspaper articles depicting the 1970 explosion were improperly admitted because they were hearsay and irrelevant. These articles were not introduced to prove the fact of the 1970 explosion and, thus, they were not hearsay since their purpose was not to prove the truth of their contents. Rather, they were introduced to show the dissemination of the news of the explosion, and, as such they were relevant to show the existence as well as the reasonableness of the fear in the mind of possible purchasers in Franklin County." 605 S.W.2d at 519.

In this case we are not dealing with the personal fears of the landowner or of any other witness. The challenged testimony was that of an expert real estate appraiser, and dealt not with his fears but the fears of buyers in the market place. It was his opinion that fear of power lines was so widespread as to affect market value. (One of KCPL's experts also acknowledged the existence of such fear, but only in "a small segment of the market.") Thus, the second and third of the three *Heddin* tests of admissibility were met.

Were the fears, if not based on experience, reasonable, and not based on "fancy, delusion or imagination"? Here is where the intermediate and the so-called minority rule meet at the edges. The Sixth Circuit rule says this is irrelevant; if the fears depress market value it matters not that they may be irrational. Other "minority" rule courts assume that the dangers from high voltage lines are self-evident and known to all mature persons. Conceptually the approaches differ; one recognizes "reasonableness" as a necessity, the other does not. Their common practical effect, however, is to eliminate the reasonableness of fear as an issue to be tried to the jury. The parties' evidence and arguments are limited to the existence of fear, its prevalence, and its effect on market value, if any. The intermediate approach requires evi-

dence on reasonableness as well as the other elements. If "reasonableness" of fear is to be an element, the minority approach has a good deal of logical appeal. It would be indeed anomalous for one jury to find fear reasonable and another unreasonable, where each jury is considering fear of the same or a similar power line.

Once again, however, the evidence in this case makes it unnecessary for us to choose. The landowner's expert testified to the perceived basis for popular fear, and that was the warning campaigns conducted by electric utilities themselves. He spoke of those campaigns from personal knowledge; their existence was not disputed, though their significance was. Although not a factor in our decision, it seems highly inconsistent for a company to warn the public repeatedly of the danger with which an instrumentality is fraught, and then say that public fear of that instrumentality is groundless. A certain amount of fear and a healthy wariness in the presence of high voltage lines strikes us as eminently reasonable. We reject the "majority" rule which would say as a matter of law that all who entertain such emotions are subject to "fancy" or "delusions," or have overwrought imaginations. If the fear is not unreasonable as a matter of law, then reasonableness is a question of fact. If we assume evidence on this issue was necessary, the landowner's evidence, although not conclusive, was persuasive.

We emphasize that the expert in this case did not attribute a dollar figure to the element of fear, any more than the expert in *City of Bonner Springs v. Coleman*, 206 Kan. 689, 695, 481 P.2d 950 (1971), put a dollar figure on damages due to lost income. The expert here gave figures only for his ultimate opinion as to value and, as in *Coleman*, in doing so must be expected as an expert to "recognize the uncertainties and contingencies and eliminate them or make proper allowances."

We think this is the appropriate way to handle this kind of element under the rationale of *Coleman*. This was the same approach used by one of KCPL's experts. His opinion of value before the condemnation took into account as a depreciating factor the "stigma" attached to land over underground quarrying operations such as were being carried on under the Willsey land. No dollar amount was attributed to the "stigma" (and by the same token, no evidence of the probability of cave-in or the reasonable

basis for the stigma was introduced). Both witnesses were properly handled in that they gave their opinions and then elaborated on the factors considered by them in reaching those opinions.

It is also significant that under present practice the jury makes no specific allowance for separate items of damage, as it did at the time of *Yagel.* K.S.A. 26-513; *Rostine v. City of Hutchinson,* 219 Kan. 320, 548 P.2d 756 (1976). *Market* value before and after the taking is the only present concern of the jury; the jury here was so instructed, and the evidence only went to market value.

We also would emphasize that under our view neither the owner nor anyone else may base an opinion of value on personal fear. What is admissible is an opinion of value of a qualified witness based on the existence of fear in the buying public in general which affects market value.

We conclude that the challenged opinion of value after the condemnation was not rendered inadmissible because it was based in part on the effect of fear on market value.

KCPL raises two other issues. First, it claims error in the trial court's refusal to permit cross-examination of Donald Willsey, the landowner, on the purchase price of the land. He testified on direct examination that the value at the time of the taking, 1976, was $10,000 per acre. KCPL sought to bring out that in 1972 he had bought out his two partners in the speculation at a price of $3,100 per acre. An objection was sustained on the grounds the sale was too remote and was not shown to be an arm's length transaction.

Whether a prior sale is too remote is a question to be determined by the trial court in the exercise of its judicial discretion. *State Highway Commission v. Lee,* 207 Kan. 284, Syl. ¶¶ 5, 6, 485 P.2d 310 (1971). The evidence in the record before us is scanty as to the change in economic conditions between 1972 and 1976, although we do recognize that it was an inflationary period. Likewise, the circumstances surrounding the sale between the partners is not shown—there was no evidence or proffer from which a determination could be made that the sale was in fact bona fide and at arm's length. An appellant has the burden of demonstrating an abuse of discretion in a ruling such as the one challenged here. We conclude no such showing has been made in this appeal.

Further, even if the exclusion of the evidence were found to be

error, we would be hard pressed to find it so prejudicial as to require a reversal. Plaintiff's testimony was to a $10,000 per acre value, with damages of $200,000. His own experts valued the land at $5,844 and $7,500 per acre, the damages at $54,050 and $71,400. The jury came in at $6,220 per acre, with $39,300 in damages. It is apparent that plaintiff's testimony was rejected by the jury even without such impeachment as the rejected evidence might have provided.

Finally, KCPL claims error in permitting evidence of increased development cost as a result of the presence of the easement. It relies on *K. C. & T. Rly. Co. v. Splitlog,* 45 Kan. 68, 25 Pac. 202 (1890); *K. C. & T. Rly. Co. v. Vickroy,* 46 Kan. 248, 26 Pac. 698 (1891); and *State Highway Commission v. Lee,* 207 Kan. 284, all holding that the "developmental" or "income" approach to value is improper, at least where development is not imminent. See also *Consultation, Inc. v. City of Lawrence,* 5 Kan. App. 2d 486, 619 P.2d 150 (1980), *rev. denied* 229 Kan. 669 (1981) (the developmental approach is improper where comparable sales are available).

As we read the challenged testimony it did not amount to a use of the developmental approach. As previously noted, both sides agreed that the highest and best use was to hold for future development of some kind. What the witness said was, no matter what kind of development took place, the easement would make it more expensive and a potential buyer-developer would take that into account in determining the amount he would be willing to pay for it. No dollar amount was attributed to this factor, no "per lot" costs were submitted to the jury, no speculative plan of development was envisioned. The expert simply said the increased costs were one element he considered in arriving at his opinion of present market value. This evidence, like the "fear" element, was admissible under the rationale of *City of Bonner Springs v. Coleman,* 206 Kan. 689, as but one factor affecting the expert's opinion of market value.

Affirmed.