485 So.2d 1374 (1986)
FLORIDA POWER & LIGHT COMPANY, Appellant,
v.
S.B. JENNINGS a/K/a S. Bryan Jennings, Jr., et al., Appellees.
No. BG-451.
District Court of Appeal of Florida, First District.
April 4, 1986.
*1375 Barry R. Davidson, of Steel, Hector & Davis, Miami, for appellant.
David W. Foerster, Jacksonville, for appellees.
JOANOS, Judge.
This is an appeal from a final judgment awarding compensation and severance damages in a condemnation proceeding. Florida Power and Light Company (FPL) seeks review of the trial court's decision to admit the opinion testimony of expert witnesses regarding alleged health hazards posed to persons living adjacent to or in the proximity of high voltage electric transmission lines. The property owners submitted the experts' opinions as one aspect of their case for recovery of severance damages. As a collateral issue, FPL seeks reconsideration of the attorney's fee and expert witness fees awarded by the trial court. We affirm.
On April 22, 1983, FPL filed a petition in eminent domain and a declaration of taking against certain named property owners in Clay County, Florida, for the construction of electric transmission and distribution lines. The interest to be acquired was a perpetual easement. On May 25, 1983, an order of taking was entered by the Circuit Court vesting interest in the subject property in FPL.
Prior to trial FPL filed a motion in limine and memorandum of law regarding the admissibility of expert witness testimony on purported adverse effects of transmission lines. FPL sought to have the testimony of expert witnesses Dr. John Dennis Norgard and Dr. Nancy Wertheimer excluded from the trial, hypothesizing that these experts would testify to adverse effects caused by transmission lines which would have reduced the value of the subject property on the date of taking and should therefore be considered in the valuation of the property. According to FPL, evidence relating to the effect of public apprehension on market value has been rejected by Florida courts as too uncertain and speculative to be considered in the valuation of property. FPL relied on Casey v. Florida Power Corporation, 157 So.2d 168 (Fla.2d DCA 1963), as representing the law in Florida on this issue, and urged that under Casey an appraiser must be able to testify that his opinion as to value is based on some facts that people who buy real estate in Clay County are knowledgeable concerning any adverse effects of high transmission lines and that these potential buyers would depreciate land adjacent to a power line before they would buy it. Otherwise, it was asserted, the evidence would have nothing to do with a valuation question in the trial.
Counsel for the property owners responded that he intended to introduce comparable sale studies from Hernando County, which has a 500,000 volt line, as does the Clay County line at issue here. In addition, counsel noted that within the eighteen months prior to the hearing, articles had been published in newspapers, magazines, and technical journals about the high transmission phenomenon. Consequently, *1376 they argued, the buying public is knowledgeable and aware of the issue, and the market place reflects this fact. Counsel urged the expert testimony was needed to show the causes of the depreciation in value which comparable sale studies would demonstrate.
The trial court rejected the arguments advanced by FPL, and ruled that the property owners would be permitted to introduce evidence of comparable sales from Nassau County, Duval County, Putnam County, and Hernando County, as well as testimony of the expert witnesses regarding the electromagnetic fields generated by 500,000 volt electrical transmission lines and their effect on human life. In addition, the court ruled this testimony would be relevant to the issue of severance damages, if severance damages were found to apply.
Trial was held on valuation of three parcels. Parcel C-3.3 is 280 feet wide and contains 41.5 acres; parcel C-12 is 220 to 280 feet wide and contains 53 acres; and parcel C-14 is 300 feet wide and contains 18.73 acres. The transmission lines erected by FPL on this property are supported by structures approximately 115 to 125 feet in height with 99 foot cross arms, and are designed to carry a maximum voltage of 550,000 volts. There are twelve such structures on parcel C-3.3, twelve on parcel C-12, and four on parcel C-14. The lines were constructed to transport power from coal fired generators in Georgia.
FPL's real estate appraiser testified that in his opinion there were no severance damages as to any of the parcels. In addition, he applied an easement factor to his valuation of the subject properties which reduced the amount of compensation due the affected property owners, based on his (the appraiser's) perception that the property owners retained some rights in the land moved against.
Testifying on behalf of the property owners were a professional planning consultant, a professor of electrical engineering, an epidemiologist, and three real estate brokers and appraisers. The planning consultant explained a number of exhibits relating to the topography of the subject lands, its adaptability to residential development, and its growth in relation to growth in surrounding counties. Based on his studies, which included information from the Clay County Comprehensive Plan, the Florida Statistical Abstract, and some documentation prepared by the Chamber of Commerce, the consultant concluded that Clay County is, percentage wise, the fastest growing county in this particular area.
Dr. Norgard, professor of electrical engineering at the University of Colorado, testified that his work over the years had involved him with and included knowledge of 500,000 volt transmission lines, particularly during his fifteen years of teaching at Georgia Tech where his assignment was to teach students how to design transmission lines for all voltages. Dr. Norgard and a colleague had been engaged by Brooks Air Force Base to conduct studies in the field of biological tissues. He testified at length concerning the massive electric field from the power lines and the tone or hum emanating from these high voltage lines. Dr. Norgard then described a coupling effect of the electrical energy into the human body and stated that the result is a long-term chronic effect and that even small amounts of energy deposits over a long period of time can produce these results.
Dr. Wertheimer, epidemiologist, stated that her first study regarding the effect of electric transmission lines happened accidentally during the course of her study of leukemia in children. She went into the field to determine whether the affected children lived near each other, whether they lived near a factory that might be polluting the environment in some way, or whether there was a localized infection involved. These field studies led Dr. Wertheimer to conclude that the common denominator was the many power transformers in the backyards of her various subjects. After three years of study, she published findings that demonstrated that children with cancer lived near power lines that put out unusually high magnetic fields. She found that 64% of the children with cancer lived near high current configuration wires, as opposed to the 31% of *1377 childhood cancer cases where no high current lines were involved. A second study concerning incidents of cancer in adults yielded the same result. Dr. Wertheimer stated that prior to 1980 studies on electromagnetic fields were performed in a somewhat perfunctory fashion, because it was generally considered that no health hazards were associated with these fields. According to Dr. Wertheimer, there has been a recent explosion of information in this field which contradicts for the most part the views formerly held. She stated that epidemiological studies conducted in Sweden, England, Canada, and the United States, indicate that constant exposure to high voltage electromagnetic fields makes it harder for the human body to fight off cancer once the cancer has started. The experts refer to this effect as one which promotes cancer, rather than one which causes cancer.
FPL presented rebuttal testimony by an electrical engineer and an associate professor of radiation and biology at the University of Rochester Medical School. The electrical engineer stated that although 500,000 volt transmission lines may under some circumstances produce perceptible electric shocks, these currents would never reach levels that are physiologically dangerous. With regard to radio and television interference in proximity to high voltage lines, the engineer acknowledged that during bad weather there would be some background radio noise. He stated also that the video portion of television could be susceptible to such interference. With regard to health effects caused by high voltage lines, the expert gave as his opinion that such effects are remote, but acknowledged the possibility of the existence of subtle or long term effects which may be occurring but are so small that they are not being noted by routine public health screening.
The associate professor, Dr. Miller, a senior scientist, has published 130 articles in the field of radiation biology. His studies have been concerned with the effects of high speed transmission lines on plant life, anatomical effects from exposure to DC magnetic fields, exposure of the human eye to electric fields, and the effects of ultrasonic sound in vitro and in vivo. All of his studies were performed in the laboratory setting, as opposed to the field studies conducted by Dr. Wertheimer. Dr. Miller agreed that from a scientific point of view, it is not possible to say that the transmission line environment is safe.
The real estate experts who testified for the property owners had all conducted studies of comparable sales of real estate in Putnam and Hernando counties with that of the subject property in Clay County. These witnesses stated that sales on a 500,000 volt line in Hernando County reflected a median loss of 40% when compared to similar sales not on the power line. In Putnam County, sales on a 240,000 volt line reflected a 37% decrease in value due to the power line. In Clay County, the subject county in this appeal, sales on an existing 240,000 volt line reflected a diminution in value of 27 to 33%, and a sale in 1984 on the 500,000 volt line reflected a decrease of 47%. According to these witnesses, their talks with buyers and with real estate brokers reflect that an issue of major concern is the possible health consequences attendant upon living in close proximity to high voltage lines. The experts concluded the present uncertainty regarding the possible detrimental effect of high voltage lines is reflected in real estate prices.
The jury returned verdicts which in each instance exceeded the valuation placed on the subject parcels by FPL's appraisers. In addition, the jury awarded severance damages as to each parcel. FPL filed a motion for new trial and/or judgment notwithstanding the verdict. Counsel for the property owners filed motions to assess attorney's fees and costs, and provided supporting affidavits, statements from experts, and a memorandum regarding costs and attorney's fees. After a hearing on the respective motions, FPL's motion was denied and the motions to tax costs and attorney's fees were granted.
Florida's constitutional guaranty of full and just compensation in eminent domain actions requires the courts to take *1378 into account "all facts and circumstances which bear a reasonable relationship to the loss occasioned an owner by virtue of his property being taken." Behm v. Division of Administration, Department of Transportation, 383 So.2d 216, 218 (Fla. 1980); Dade County v. General Waterworks Corporation, 267 So.2d 633 (Fla. 1972); Jacksonville Expressway Authority v. Henry G. DuPree Company, 108 So.2d 289 (Fla. 1958); Orange State Oil Company v. Jacksonville Expressway Authority, 110 So.2d 687 (Fla. 1st DCA 1959). Full compensation contemplates compensation for (1) damage to remaining lands, and (2) reimbursement by the condemnor to the owner for appraisers' fees incurred in establishing the extent of the owner's damage. Jacksonville Expressway Authority v. Henry G. DuPree Co., 108 So.2d at 292. This right to severance damages has been codified as Section 73.071(3)(b), Florida Statutes, which provides, in relevant part that 
(3) The jury shall determine solely the amount of compensation to be paid, which compensation shall include:
(b) Where less than the entire property is sought to be appropriated, any damages to the remainder caused by the taking, ...
See: Lee County v. Exchange National Bank of Tampa, 417 So.2d 268, 269 (Fla.2d DCA 1982).
In determining full compensation, market value is an important element but it has been rejected by Florida courts as the exclusive standard if utilization of market value will fail to provide an accurate determination of full compensation. Dade County v. General Waterworks Corporation, 267 So.2d at 641. In other words, "[f]air market value is merely a tool to assist us in determining what is full or just compensation, within the purview of our constitutional requirement." Jacksonville Expressway Authority v. Henry G. DuPree Company, 108 So.2d at 291. Accord: Orange State Oil Company v. Jacksonville Expressway Authority, 110 So.2d at 691.
In ruling on FPL's motion in limine, the trial court applied the rationale articulated in Selective Resources v. Superior Court, 145 Ariz. 151, 700 P.2d 849 (Ariz. App. 1984), which raised the same issue presented in the instant case, i.e., the propriety of admitting into evidence the testimony of expert witnesses concerning adverse biological effects of exposure to electromagnetic fields. Arizona's constitution, like that of Florida, makes provision for just compensation when private property is taken for public use. The court in Selective Resources found that Arizona's courts have adopted "a definition of market value predicated on an informed buyer, ... who is deemed to be aware of all factors which affect the value of the land in relation to its highest and best use." Id., 700 P.2d at 852. Under this rule 
The condemnee ... need only establish that the severance or the construction of the improvement in the manner proposed by the condemnor will affect his remaining land in a manner which would diminish its value to a prospective buyer who is informed of the conditions resulting from the severance. Such conditions may affect the suitability of the remaining land for the purposes for which it was used or capable of being used prior to condemnation, or may completely change its highest and best use. In either event, evidence of the changed conditions resulting from the severance or the construction of the improvement in the manner proposed [is] directly relevant to the issue of damages ... and is also admissible to support the conclusions of valuation experts. Id.

In the instant case, FPL insists that Casey v. Florida Power Corporation, 157 So.2d 168 (Fla.2d DCA 1963), represents the law of Florida with regard to opinion evidence as to valuation in a condemnation case. Casey concerned a 230,000 volt transmission line, as opposed to the 500,000 volt transmission line which is the subject of this appeal. In Casey the property owners offered testimony which "would tend to show that the presence of towers and power lines upon the property would result in a *1379 general reluctance on the part of prospective purchasers to purchase the land adjacent to the easement." Id., 169. The court was persuaded by the argument presented by Florida Power Corporation, and viewed the opinion testimony as "too highly speculative ... to be taken into consideration." The Casey court then adopted what Florida Power Corporation had termed the "majority rule," i.e., "opinion evidence as to value in a condemnation case, based upon fear of a steel tower and high voltage transmission lines, is too speculative and conjectural to be considered as an element of damage to adjacent land." Id., 170.
The "majority-minority" label applied by the court in Casey may be a misnomer since apparently only four states, Florida, Alabama, West Virginia, and Illinois, follow the so-called majority rule, which rejects "evidence of fear even though it affects market value." See: Willsey v. Kansas City Power & Light Company, 6 Kan. App. 2d 599, 631 P.2d 268, 274 (Kan. Ct. App. 1981). Eleven states and the Sixth Circuit apparently follow the "minority" rule and admit such evidence on a simple showing that fear affects market value; nine states follow the intermediate rule, "admitting evidence of the existence of fear and its effect on market value if it is shown that the fear has some reasonable basis." Id., 631 P.2d 274-275.
Implicit in the trial court's refusal to follow Casey is the view that recent studies and tests on the effects of electromagnetic fields have taken expert opinion on the subject out of the realm of "mere ignorance and fear" which was proscribed in Casey. Florida courts have held that "the trial judge has wide discretion concerning admissibility of evidence," and a ruling on admissibility will not be disturbed absent a showing of abuse of discretion. Key v. State, 430 So.2d 909, 910 (Fla. 1st DCA 1983). See also: Ehrhardt, Florida Evidence, s. 702.2, f.n. 5, at p. 400 (2d Ed. 1984), citing Mutual Life Insurance Company of New York v. Bell, et al., 147 Fla. 734, 3 So.2d 487 (1941). We find no abuse of discretion in the trial court's decision to admit the opinion testimony of Dr. Norgard and Dr. Wertheimer.
We consider the rule which the Casey court characterized as the "intermediate rule" to be the approach best designed to give effect to Florida's constitutional provision mandating full compensation in an eminent domain proceeding. Under this rule, evidence of the existence of fear and its effect on market value may be admitted into evidence as a factor or circumstance to be considered by the trier of fact in a property valuation proceeding, so long as it is shown that the fear has a reasonable basis. We consider the expert opinion testimony offered in this case is sufficient to comply with the intermediate rule, and we affirm the final judgment entered by the trial court.
Because our decision in this case is in conflict with the second district's ruling in Casey, and because we recognize that this decision is a matter of great public importance, we certify the following question to the Florida Supreme Court:
IS EVIDENCE OF THE EXISTENCE OF FEAR AND ITS EFFECT ON MARKET VALUE ADMISSIBLE AS A FACTOR IN PROPERTY VALUATION, IF IT IS SHOWN THAT THE FEAR IS REASONABLE.
Affirmed.
SHIVERS and NIMMONS, JJ., concur.